UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

In Re:

GREGORY A. GOLLIDAY,

Debtor.

Chapter 7
Case No. 16-20014

GREGORY A. GOLLIDAY,

Plaintiff,

v.

EDUCATIONAL CREDIT MANAGEMENT
CORP.

Defendant.

Adversary Proceeding
Case No. 16-02028

## MEMORANDUM OF DECISION

Gregory A. Golliday (the "Plaintiff") seeks to discharge under 11 U.S.C. § 523(a)(8)[1]

certain loan obligations he owes to Education Credit Management Corporation ("ECMC").   An

evidentiary hearing took place on September 28, 2017, during which the Plaintiff was the sole

witness.   The parties jointly offered eighteen exhibits, all of which were admitted into evidence

without objection.   The Plaintiff and ECMC filed post-hearing briefs on October 26, 2017 and

November 20, 2017, respectively, and the Plaintiff filed a reply brief on November 22, 2017.   The

matter was then taken under advisement.   Upon review of the evidence submitted by the parties,

and for the reasons set forth below, the Court finds that the Plaintiff did not satisfy his burden

---

[1] References to statutory sections numbers are to the Bankruptcy Reform Act of 1978, as amended, at 11 U.S.C. §
101 *et seq.* (the "Code").

under § 523(a)(8) and, therefore, judgment will be entered in favor of ECMC and against the Plaintiff.

## I.    Jurisdiction and Venue.

The Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§157(a) and 1334 and the United States District Court for the District of Maine Local Rule 83.6(a).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    Background.[2]

The Plaintiff is 54 years old and resides with his wife.  At the time of trial, the Plaintiff's household also included his twenty-year-old stepdaughter.

### A.  The Student Loan Debt.

In or around 1995, the Plaintiff commenced chiropractic studies at Life University which were funded, at least in part, by a series of subsidized and unsubsidized Stafford loans and a Perkins loan totaling $74,800.00 (the "Student Loans").  Neither party offered into evidence a payment history on the Student Loans so it is impossible to determine how many payments, if any, the Plaintiff made on these original obligations.  On October 6, 2001 the Plaintiff applied for consolidation of these loans and on January 9, 2002, College Loan Corporation issued a $91,444.00 consolidation loan (the "Consolidated Loan").    College Loan Corporation subsequently assigned its rights under the Consolidated Loan to ECMC and it is this indebtedness

---

[2]  The factual background provided here is taken from exhibits admitted at trial (Joint Exhibits 1-18), the Plaintiff's testimony, and certain documents filed by him in a prior bankruptcy case.  While the documents from the Plaintiff's prior case, 09-21874, were not offered into evidence by either party, the Court takes judicial notice of the schedules and statement of financial affairs filed in that case pursuant to Fed. R. Evid. 201.  The information presented to the Court by the Plaintiff in his prior schedules or statement of financial affairs has not been challenged or disputed.  *See, e.g.*, In re Madera, 2008 WL 351446 *1 n. 1 (Bankr. E.D. Pa. Feb. 7, 2008).  Moreover, the Plaintiff declared the information set forth in the schedules to be true and accurate under penalty of perjury and, therefore, they constitute judicial admissions.  *See*, Morgan v. Musgrove (In the Matter of Musgrove), 187 B.R 808 (Bankr. D.Ga. 1995).

the Plaintiff seeks to discharge by this action.   Prior to trial, the parties stipulated that: (i) the Consolidated Loan constitutes a qualified educational loan for purposes of § 523(a)(8); (ii) as of September 26, 2016, the Plaintiff owed $207,157.16 in principal, accrued interest, fees and costs on the Consolidated Loan; and (iii) the Consolidated Loan is the type of loan which falls under § 523(a)(8).

Beginning on February 28, 2002 and continuing through February 28, 2006, the Consolidated Loan was almost constantly in deferment status.   During the period beginning on March 30, 2006 and ending November 19, 2006, the Plaintiff made nine payments on the Consolidated Loan, each in the amount of $689.14.  The Consolidated Loan was once again placed in forbearance on December 28, 2006 and remained that way until December 2, 2009 when it moved into "repayment" status.  Although the Consolidated Loan remained in "repayment" status from December 2, 2009 to March 27, 2014, the record does not evidence any actual payments made during this period.  The Consolidated Loan was placed into hardship forbearance status two more times: (i) March 27, 2014 through August 27, 2014; and (ii) December 27, 2015 through October 17, 2016.  The Plaintiff does not appear to have made any payments since November 19, 2006.

   *B.   The Plaintiff's Chiropractic License.*

After graduating college with a degree in business management in or around 1986, the Plaintiff moved to Detroit and found employment as a health club manager.  He then moved to Alaska in late 1988 or early 1989, where he worked as a commercial fisherman.   After a couple of years in that industry, the Plaintiff began taking pre-requisite classes at Florida Atlantic University in order to qualify for chiropractic studies.  He later transferred to Life University,

3

where he finished his pre-requisite courses, entered the chiropractic program, and successfully achieved his Doctor of Chiropractic degree in 1999.

The Plaintiff came to Maine in the late fall of 1999 to commence his chiropractic career but, on September 25, 2000, the Maine Board of Chiropractic Licensure (the "Board") received a complaint from one of the Plaintiff's clients alleging that he had engaged in unprofessional conduct. That complaint lead to a Consent Agreement dated May 15, 2001 (the "First Consent Agreement") by and between the Plaintiff, the Board and the Maine Department of the Attorney General (the "Attorney General"). Pursuant to the terms of the First Consent Agreement, the Plaintiff was required to pay a $500.00 fine, accept a six-month suspension and undergo a two-year probationary period. In addition, the terms of that agreement prohibited the Plaintiff from treating female patients without the presence of a third party for a period of one year. The Plaintiff was further required to submit to supervision by a licensed chiropractor for the duration of the probationary period. Finally, the Plaintiff was required to attend, and successfully complete, a Board-approved course concerning appropriate doctor-patient interactions, boundaries and relationships.

On March 13, 2002, the Plaintiff informed the Board that he was no longer engaged in active practice and requested modification of the First Consent Agreement to reflect this change in his circumstances. The Plaintiff, the Board and the Attorney General entered into the Second Consent Agreement, dated March 13, 2002. The Second Consent Agreement contained substantially the same terms as the First Consent Agreement but included a finding that the Plaintiff was, at the time, no longer engaged in the active practice of chiropractic and delayed the commencement of the two-year probationary period until such time as the Plaintiff intended to return to practice. The Second Consent Agreement also stated that, "Violation of any of the terms

or conditions of this Second Consent Agreement shall constitute grounds for discipline, including but not limited to modification, suspension, or revocation of licensure or the denial of licensure or re-licensure." Joint Exhibit 6, Second Consent Agreement, ¶ 11.

At some point, the Plaintiff must have satisfied all of the conditions contained in the Second Consent Agreement because in 2005, with the assistance of his wife at the time, Ms. Sarah D'Anto, and Ms. D'Anto's parents, he formed Crane Chiropractic, Inc. ("Crane"). Approximately two years after Crane opened its doors, the Plaintiff and Ms. D'Anto divorced. The Plaintiff testified that, at the time of the divorce, Crane's practice was doing well but soon thereafter, medical insurance ceased covering massage therapy, which was a form of treatment critical to the type of chiropractic services the Plaintiff provided. The resulting impact of the changes in medical insurance on Crane's profitability, coupled with a large debt owed to Ms. D'Anto as a result of the divorce proceedings, forced the Plaintiff to wind down Crane sometime in 2009.

In or around November of that year, the Plaintiff formed Chiropractic Mobile Services ("CMS"), a mobile chiropractic office operating out of Standish, Maine. On December 28, 2011, however, the Plaintiff self-reported a November 30, 2011 incident to the Board during which he had again engaged in unprofessional conduct. A January 3, 2012 letter from the Plaintiff's attorney confirmed the incident and stated that the Plaintiff had self-imposed certain restrictions on his practice including, but not limited to, requiring the presence of a third party during treatment of female patients. During a subsequent investigation, the Board discovered a second patient who reported to the Plaintiff's employer that the Plaintiff had made unprofessional, personal comments to her during a massage therapy session. The Board's findings resulted in an immediate, thirty-day suspension issued on February 7, 2012.

On March 15, 2012, the Plaintiff entered into another Consent Agreement with the Board and the Attorney General (the "Third Consent Agreement"), thereby avoiding an adjudicatory hearing.   In the Third Consent Agreement, the Plaintiff stipulated that he had engaged in unprofessional conduct with two separate clients, voluntarily surrendered his chiropractic license and agreed to certain conditions to re-applying for licensure.   Those conditions include, but are not limited to: (i) proof of counseling from a qualified, Maine-licensed provider (the "Counseling Provider") pre-approved by the Chiropractic Complaint Committee (the "Committee"); (ii) a report from the Counseling Provider opining that the Plaintiff is qualified to provide chiropractic services without presenting a threat to the public or to any particular patient; and (iii) a psychological report (the "Psychological Report") prepared by someone other than the Counseling Provider and someone who, among other requirements, is pre-approved by the Committee.

In addition, the Plaintiff must provide proof that any chiropractic services he may provide in the future are offered within an employment arrangement pre-approved by the Committee, such approval being subject to the following conditions, among others: (i) the Plaintiff must be employed by a licensed chiropractor; (ii) the employer must be present at the office when the Plaintiff renders chiropractic services, supervise the Plaintiff's practice and have access to all records generated by the Plaintiff; and (iii) all services to a female patient must be chaperoned by a licensed chiropractor or an individual licensed as a permanent or temporary chiropractic assistant.   Unlike in the First and Second Consent Agreements, there are no temporal limitations on these restrictions.

The Plaintiff has not taken any meaningful steps toward returning to practice and he is not currently licensed to provide chiropractic services.

*C.  The Plaintiff's Domestic Support Obligations.*

On June 1, 2007, a Divorce Judgment ended the Plaintiff's marriage to Ms. D'Anto and ratified a Settlement Agreement the ex-spouses entered into on the same date. Although the Plaintiff had not made a payment on the Consolidated Loan since November 19, 2006—and had made just nine payments on that loan since it issued on January 9, 2002—the Plaintiff agreed, under the terms of the Settlement Agreement, both in his individual capacity and as president of Crane, to give Ms. D'Anto a promissory note in the amount of $177,500.00, payable at seven percent (7%) interest over a seventeen-year term (the "Promissory Note").[3] The Plaintiff testified at trial that he agreed to execute the Promissory Note because, at the time of the divorce, Crane was generating steady income and he knew he would need to repay Ms. D'Anto in order to keep the profitable business in operation.

On December 5, 2008, the Plaintiff and Ms. D'Anto modified the terms of the Promissory Note so that the Plaintiff and Crane were required to pay $750.00 each month from November 2008 through April 2009, and then pay $1,730.00 each month starting in May 2009. The Plaintiff and Crane soon, if not immediately, defaulted under the modified Promissory Note and in September 2009, Ms. D'Anto commenced a collection action against the Plaintiff in the Cumberland County Superior Court (the "State Court"). On July 31, 2013, the State Court granted summary judgment in favor of Ms. D'Anto, awarding her $255,979.00, comprised of $174,988.80 in principal, $72,955.41 in interest, $2,548.26 in late fees, and $5,487.21 in attorney fees (the "DSO Judgment"). The State Court further awarded Ms. D'Anto interest for the period March 9, 2013 through July 31, 2013 at the rate of $47.9419 per day, totaling $6,951.58. The DSO Judgment concluded with the following: "The Court notes for the Defendant's benefit that the 'disclosure hearing' he seeks will take place if Plaintiff proceeds to enforce her money judgment pursuant to

---

[3] The Promissory Note was intended to repay to Ms. D'Anto money she borrowed and invested into Crane when she and the Plaintiff opened the business. That loan was secured by a mortgage on Ms. D'Anto's personal residence.

Title 14, Chapter 502.  If he is subpoenaed to appear, the District Court will take evidence in order to determine his ability to satisfy the judgment and the best and most practicable way for him to do so." Joint Exhibit  17, p. 17.

The Plaintiff testified that Ms. D'Anto sought court enforcement of the DSO Judgment on two or three occasions.  Although the Plaintiff did not testify that he received the benefit of a disclosure hearing, the record suggests that at least two such hearings were held and a third was at least offered.  A spreadsheet prepared by Ms. D'Anto and jointly offered into evidence by the parties indicates that Ms. D'Anto paid a "disclosure filing fee" on November 21, 2013 and again on June 22, 2015.  That spreadsheet also shows the date and amount of each of the twenty-five payments the Plaintiff made on the DSO Judgment between entry of that judgment on July 31, 2014 and January 15, 2016, which is the last date an entry was recorded on the spreadsheet.

| Date | Payment Amount |
| --- | --- |
| December 30, 2013 | $75.00 |
| January 31, 2014 | $75.00 |
| March 7, 2014 | $75.00 |
| April 3, 2014 | $75.00 |
| May 3, 2014 | $75.00 |
| June 3, 2014 | $75.00 |
| August 3, 2014 | $75.00 |
| September 7, 2014 | $75.00 |
| October 3, 2014 | $75.00 |
| November 1, 2014 | $75.00 |
| December 2, 2014 | $75.00 |
| January 3, 2015 | $75.00 |
| February 3, 2015 | $75.00 |
| March 1, 2015 | $75.00 |
| April 2, 2015 | $75.00 |
| May 8, 2015 | $75.00 |
| June 3, 2015 | $75.00 |
| July 8, 2015 | $75.00 |
| August 4, 2015 | $75.00 |
| August 18, 2015 | $120.00 |
| September 11, 2015 | $130.00 |
| September 21, 2015 | $195.00 |
| October 21, 2015 | $130.00 |

| October 27, 2015 | $195.00 |
| November 23, 2015 | $130.00 |

The timing of the "disclosure filing fee payments" in relation to the payment history above indicates that these payments were made to satisfy State Court orders entered after a disclosure hearing established the Plaintiff's ability to make payments in some amount.

The Plaintiff's testimony supports this conclusion. He testified that he believes the most recent State Court order directed him to pay $400.00 per month, but he is not certain of the exact figure. He said that the increase came at a time when he was not paying insurance premiums because he was transitioning from one job to another. Although he explained that his increase in income was only temporary, the State Court found that the record nonetheless established his ability to make those payments at that point in time. He was told to make the payments and return in six months for the purpose of reassessing the feasibility of the payments going forward.

The Plaintiff filed the underlying bankruptcy case on January 15, 2016. On June 20, 2016, Ms. D'Anto commenced an adversary proceeding seeking a determination that the Plaintiff's obligations under the DSO Judgement are excepted from discharge under §§ 523(a)(5) or (15). On November 29, 2016, this Court endorsed a consent judgment entered into by Ms. D'Anto and the Plaintiff, pursuant to which the DSO Judgment obligations were deemed nondischargeable domestic support obligations under § 523(a)(5) and § 727 of the Code.

### D. The Plaintiff's Past Income.

The Plaintiff did not present any evidence establishing his income or expenses between 1999—the year he obtained his chiropractic degree—and 2012. The earliest financial information the Court can find is the schedules and statement of financial affairs filed by the Plaintiff in his prior bankruptcy case, case number 09-21874, commenced on December 3, 2009. These

documents provide a cursory glimpse of the Plaintiff's income in the three years leading up to the 2009 filing. They do not present information regarding his income for the years 1999 through 2006 nor his expenses for the years 1999 through November of 2009.

The Plaintiff filed his schedules and statement of financial affairs in case number 09-21874 on January 4, 2010. Schedule I indicated that the Plaintiff, who was unmarried at the time, was a self-employed chiropractor doing business as CMS.[4] The Plaintiff listed $7,818.00 in monthly income in Schedule I, comprised of $5,100 in monthly income from Chiropractic Mobile Services and $2,718.00 in monthly income from Brown Chiropractic ("Brown"). The Plaintiff stated that the $5,100.00 in income from CMS was a projection based on one month of operations. Schedule J showed $7,263.00 in monthly expenses including $645.00 per month in alimony, maintenance, and support and $778.00 per month in student loans. Notwithstanding the substantial support and student loan payments, the Plaintiff projected $555.00 in monthly net income.

In response to the first question in the Statement of Financial Affairs which asked the Plaintiff to "[s]tate the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business . . ." for the years 2007 through 2009, the Plaintiff listed "gross receipts" from Crane in the amount of $148,098.60 in 2007 and $122,522.44 in 2008. "Gross receipts" for the period January 1, 2009 through November 15, 2009—the date Crane closed—totaled $73,944.49.[5]

---

[4] Though Schedule I indicates CMS was a d/b/a, the Statement of Financial Affairs shows that this business was a separate corporate entity with its own employee identification number.

[5] The Plaintiff's use of the term "gross receipts" in this context is confusing. The first question on the Statement of Financial Affairs asks for the debtor's income during the relevant period. Since Crane was a separate corporate entity, the income reported in the Plaintiff's answer should have been the salary, wages or other compensation he received from Crane, as well as any shareholder distributions. However, the Plaintiff's use of the term "gross receipts" suggests that these figures represented Crane's gross profits before netting out operating expenses.

On November 30, 2010, the Plaintiff filed amended Schedules I and J which disclosed his August 7, 2010 marriage to his current spouse, Jennifer O'Gara.  The Plaintiff's household expanded to include both Ms. O'Gara and her 14-year-old child.  His Amended Schedule I reported that he had been employed by Brown for one year and six months and that CMS had been in operation for one year.   The Plaintiff listed $5,299.34 in monthly income, comprised of $3,466.67 in gross earnings from CMS and $2,365.00 in earnings from Brown, less certain payroll deductions.   While the Plaintiff's monthly income was lower than he projected in his original Schedule I, his new spouse contributed another $2,650.00 in monthly income from her house-cleaning business plus $455.00 per month in social security or government assistance.   The household's annual income totaled $100,848.00.   Amended Schedule J listed $7,872.00 in expenses, including the $778.00 in monthly student loan payments and the $593.00 in monthly support payments.   After expenses, then, the Plaintiff's household was left with approximately $532.34 in disposable income each month.

The record does not establish how long the Plaintiff and Ms. O'Gara enjoyed this level of income.   The earliest evidence of income offered by the Plaintiff in this case was his tax returns for the years 2012 through 2016. The income reported in the returns is as follows:

| Year | Plaintiff | Spouse[6] | Total |
|------|-----------|-----------|-------|
| 2012 | $2,165.00 | $8,028.00 | $21,329.00 |
| 2013 | $21,757.00 | $7,782.00 | $29,556.00 |
| 2014 | $34,761.00 | $8,197.00 | $42,958.00 |
| 2015 | $23,481.00 | $8,558.00 | $38,055.00 |
| 2016 | $34,565.00 | $8,464.00 | $43,044.00 |

---

[6] These figures represent Ms. O'Gara's income from operation of her business, Maid Brigade, less certain operating expenses.

11

In the three years leading up to the trial, the Plaintiff's household earned, on average, approximately $40,000 each year.[7]

During this period, the Plaintiff held a number of different jobs. He testified that in May 2012 - two months after he surrendered his license - he was in the commercial cleaning and painting business. He left that job six months later, in November 2012, to join Scott's, Inc. where he worked in product merchandising. In July 2013, the Plaintiff moved on to employment at Home Depot as a product merchandiser, but the very next month he left that position to start as a lawn technician at TruGreen, Inc. He worked for TruGreen for approximately two years before leaving in June 2015 to start working in lawn care for Lucas Tree. Shortly before trial he quit his job at Lucas Tree and as of the trial was unemployed.

*E. The Plaintiff's Present Income.*

On January 15, 2016—the same date he commenced the underlying bankruptcy case—the Plaintiff also filed schedules. According to Schedule I, the Plaintiff was earning $3,241.33 in gross monthly wages at the time of filing. After $356.07 in tax, Medicare and social security deductions and $727.22 in deductions for insurance, the Plaintiff's monthly take-home pay was $2,158.04. In addition, the Plaintiff's spouse, Ms. O'Gara, contributed another $750.00 each month in income from Maid Brigade. In all, the household's monthly income totaled $2,908.04, or $34,896.48 annually.

The Plaintiff's Schedule J, also filed on January 15, 2016, showed $2,806.00 in monthly expenses, leaving $102.04 in disposable income each month. The Plaintiff's expenses included, among other things, $871.00 in rental or home ownership expenses, $150.00 in heating costs,

---

[7]   While these returns establish the household's income for 2012 through 2016, they do not provide any insight into its expenses.

$225.00 in phone, internet and cable, $450.00 in food and housekeeping supplies and $100.00 in disability insurance.

The Plaintiff filed an amended Schedule I on September 22, 2016. This most resent version of Schedule I is puzzling because it indicates that the Plaintiff is unmarried and that a "girlfriend" contributes $400.00 each month to help cover household expenses. The "girlfriend's" actual income is not disclosed. Although the Plaintiff signed the declaration stating under penalty of perjury that he had read the amended Schedule I and that it was true and correct, he testified at trial that he married Ms. O'Gara before he filed the underlying bankruptcy case and remained married to her throughout the case. His 2016 tax return supports this testimony. The amended Schedule I shows monthly net income of $2,780.00 but the evidentiary value of this schedule is questionable considering the material error in omitting the Plaintiff's spouse.

The Plaintiff also filed an amended Schedule J on September 22, 2016 which, for the most part, lists the same expenses set forth in the original Schedule J, but varies in the amount of the expenses. In some cases, the expenses are substantially less in the amended Schedule J which suggests that the newer version of the schedule lists only the Plaintiff's share of the household expenses. For instance, the Plaintiff's rental or home ownership expenses decreased from $871.00 to $400.00 and his heating costs went from $150.00 to $100.00. Phone, internet and cable decreased from $225.00 to just $80.00. Some expenses, however, increased. Food and housekeeping grew from $450.00 to $650.00 and $100.00 in disability insurance turned into $300.00 for "girlfriend's insurance." In all, the Plaintiff's monthly expenses decreased from $2,806.00 shown in the original Schedule J to $2,610.00 reflected in amended Schedule J. Together, the amended Schedule I and J show monthly disposable income of $170.00.

Finally, in responses to interrogatories, the Plaintiff replied that he was married and separately listed the income he and his wife generated. He also separately accounted for the expenses that each of them is responsible for paying. Once again, the expenses vary from the original and amended Schedule J. For instance, a car payment appearing in the amount of $309.00 on the original Schedule J, and $310.00 on the amended Schedule J, does not appear at all in the list of expenses set forth in the Plaintiff's interrogatory responses.

The variations in income and expenses and, in some instances, the misinformation, suggests a carelessness in preparing financial disclosures in connection with this case that casts the veracity of the original and amended schedules and the interrogatory responses in some doubt. Notwithstanding this concern, the Court does note that the income reported on both versions of Schedule I is roughly consistent with the income reported in the Plaintiff's 2014, 2015 and 2016 tax returns.

*F.   The Plaintiff's Future Income.*

Six days before trial, the Plaintiff quit his job with Lucas Tree because it was too physically demanding. He testified that he was the oldest employee in his division and that he suffers from a degenerative shoulder condition which will eventually require shoulder replacement surgery. At the time of trial, the Plaintiff, who earned a commercial driver's license in 2017 while working for Lucas Tree, was seeking employment as a truck driver. Prior to quitting his job, the Plaintiff received an offer from a company willing to pay him one dollar more per hour than he was earning at Lucas Tree. The Plaintiff subsequently discovered, however, that the cost of insurance at the new company would result in less take home pay. That offer was still open when the Plaintiff appeared for trial and he testified that he had a couple of other employers interested in hiring him as a truck driver. All of the employers paid approximately the same hourly wages but the cost of

their insurance varied.  The Plaintiff was trying to determine which compensation package provided the most value.  He hoped to make at least as much as he made at Lucas Tree but he did not expect to make significantly more based on the offers he had received to date.

The Plaintiff asserts that he is not capable of making substantially more than he is currently earning.  He testified that he will never be able to return to the chiropractic field because the conditions set forth in the Third Consent Agreement are simply too onerous.  Although the Plaintiff did attend counseling for some period of time, he testified that the attorney who represented him in connection with the Third Consent Agreement advised him not to submit to a psychological exam because an adverse ruling could negatively impact his employability across a number of industries.  The Plaintiff expressed disbelief that he could find a chiropractor willing to take on the risk and expense of employing a repeat offender who must be monitored and chaperoned.

Even if he did manage to reacquire his license, the Plaintiff testified that he cannot earn enough as a chiropractor to maintain a minimal standard of living while also repaying the Consolidated Loan and the DSO Judgment.  He testified that his annual salary while employed by Brown was just $48,000.00 each year but that testimony is misleading.  While the schedules filed in case number 09-21874 indicate that he was earning somewhere between $32,616.00 (original Schedule I) and $28,380.00 (amended Schedule I) from Brown, he was also operating CMS at the same time and his combined annual income from these two practices appeared to be approximately $63,000.00 (amended Schedule J).  Nonetheless, the Plaintiff asserts that his income would likely be far lower now because he does not believe women will consent to treatment by a chiropractor who needs to be chaperoned. Interestingly, the Plaintiff did not testify as to whether the same requirement under the Second Consent Order negatively impacted his business.

15

Additionally, the Plaintiff testified that even if he could regain his license, and he can make more money as a chiropractor, he will not return to practice. He spoke passionately about the shame he would feel if clients discovered his past but he also feels strongly that he cannot be trusted to provide chiropractic services without engaging in inappropriate behavior.  In his opinion, returning to practice would be like "an alcoholic working in a bar."

The Plaintiff asserted that his employment options are further limited by the presence of arthritis in his shoulder; a condition he says is continuing to deteriorate.  He testified that he will eventually need a complete shoulder replacement but that he is trying to wait as long as he can for such a surgery in order to limit the risk a second shoulder replacement in the future.  The Plaintiff asserts that, as a result of this condition, he can no longer work in physically demanding industries like tree removal and commercial fishing.  Further, his shoulder was also problematic in his chiropractic career because his practice focused on manual adjustment services.  He required physical therapy when he was actively practicing chiropractic but his shoulder has deteriorated even more since surrendering his license.

Finally, the Plaintiff testified that, despite his business management degree, he is not qualified for well-paying managerial positions.  While he has applied to some openings he was passed over in favor of other candidates with greater managerial experience or more in-depth, industry-specific knowledge. He testified that the managerial jobs for which he is qualified do not pay well.  The Plaintiff did not list, or give examples of, the managerial positions to which he has applied.

Based on the foregoing, the Plaintiff does not expect the household's income to substantially increase in the future.  He testified that his wife's business, Maid Brigade, cannot generate more income because she works alone.  This testimony, however, conflicts with the

amended Schedule I filed in Case No. 09-21874, which shows that, at one time, Ms. O'Gara contributed $2,650.00 in income to the household each month from her housecleaning business. That figure is far in excess of the $750.00 in income shown in the original Schedule I filed in this case.

The Plaintiff's schedules indicate that he and his family pay only the most basic expenses but some of those expenses should decrease over time.  The Plaintiff testified that his wife's car, for which she pays $443.00 per month, will be paid off sometime within the next year.  He also expects to pay off a credit card in the coming months.  Further, the Plaintiff testified that, as of the trial, his 20-year-old step-daughter continued to be covered under his insurance policy and is "in and out of" the Plaintiff's house.  It is not clear how much time the step-daughter spends in the Plaintiff's home, or whether any of the expenses on amended Schedule J or in the interrogatory responses might be attributable to her but it seems likely, if not certain, that the household expenses will decrease as the step-daughter becomes more financially independent.  This is most certainly true with respect to insurance costs.

Ms. O'Gara owns the house in which the Plaintiff and his family reside.  The residence is encumbered by a USDA Loan.  Although the maximum mortgage payment on the loan is approximately $1,500.00, Ms. O'Gara and the Plaintiff were paying approximately $1,032.00 at the time of trial due to payment subsidies.  The Plaintiff testified that, as his income increases, his mortgage payment will also increase up to $1,500.00 each month.

Neither party called Ms. D'Anto as a witness but the Plaintiff testified that he does not believe—based on her persistence in enforcing the DSO Judgment—that Ms. D'Anto will ever voluntarily accept less than the full balance due under the DSO Judgment. He expects she will

continue to take steps to collect on the debt, which is accruing at a post-judgment interest rate of 6%.

The Plaintiff has no savings and does not contribute any funds to a retirement account.

### III.    Legal Standard.

A discharge under § 727 of the Code does not discharge a student loan unless "excepting such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8). The creditor bears the initial burden of establishing that the debt is the type excepted from discharge. Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 797 (1st Cir. B.A.P. 2010). Once this initial burden has been satisfied, the burden shifts to the debtor to prove undue hardship by a preponderance of the evidence. Id.

Courts have developed several tests for determining whether a debtor has established an undue hardship. This Court employs the "totality of the circumstances" test. Bronsdon, 435 B.R. at 797-798. Under that test, the Plaintiff is required to "prove by a preponderance of the evidence that (1) . . . his past, present, and reasonably reliable future financial resources; (2) . . . his and . . . [his] dependents' reasonably necessary living expenses; and (3) other relevant facts and circumstances unique to the case, prevent [him] from paying the student loans in question while still maintaining a minimal standard of living . . ." Id. (citing In re Lorenz, 337 B.R. 423, 431 (1st Cir. B.A.P. 2006).

### IV.    Analysis.

In applying the Bronsdon test to the record before the Court, it becomes clear that the Plaintiff has not met his burden of proof.

*A.  The Plaintiff's Past Income and Expenses.*

The Plaintiff focused primarily on his present and future financial resources but he neglected to establish that his past financial resources and living expenses prevented him from repaying the Consolidated Loan while maintaining a minimal standard of living.  Although the Plaintiff incurred the Student Loans during the period beginning in 1995 and ending in 1996, he did not introduce any evidence establishing his income prior to 2012.  The earliest evidence of his expenses was his original Schedule J filed in his underlying bankruptcy case on January 15, 2016.

The failure to establish his past income and expenses is significant in this case because the Plaintiff's request for a hardship discharge rests, primarily, upon his argument that the Consolidated Loan and, for that matter, the DSO Judgment, are so substantial, and continue to accrue interest at such aggressive rates, that he will never be able to repay the Consolidated Loan while also making payments on the DSO Judgment and his other household expenses.  However, the payment history on both obligations indicates that he has never made any significant payment on either debt.  If the Plaintiff could not make payments on the Student Loans or, later, the Consolidated Loan, because his past income was insufficient to do so while maintaining a minimal standard of living, that alone would not be a disqualifying factor under the Bronsdon test.  If, however, the Plaintiff earned sufficient income to make those payments and he simply chose not to do so, then his request for a hardship discharge on the basis that those loans have grown to an insurmountable size would ring hollow.

So, in an attempt to discern more about his past finances, the Court looked to the schedules and statement of financial affairs he filed in case number 09-21874.  Unfortunately, those documents raised more questions than they answered.  The Plaintiff appears, based on the original schedules and amended schedules filed in that case, to have been earning, for some period of time, somewhere between $63,592.08 and $93,816.00 annually.  After Ms. O'Gara married him during

the pendency of that case, their household generated $100,852.08 in annual income.   The household had more than $500.00 in disposable monthly income after expenses, including purported payments on both the Consolidated Loan and the DSO Judgment.  In fact, the disposable monthly income was likely higher because based on the payment history provided by ECMC and the spreadsheet prepared by Ms. D'Anto, it appears the Plaintiff was not actually making any payments on either the Consolidated Loan or the DSO Judgment during this period.

The Plaintiff and Ms. O'Gara's joint tax returns for the years 2012 through 2016 establish that the Plaintiff's income, as well as Ms. O'Gara's, decreased substantially after the Plaintiff surrendered his license.  Although the decrease in the Plaintiff's income is not surprising, the Plaintiff did not explain why Ms. O'Gara's housecleaning business also began producing less income around this same time.  Regardless, the income the household generated during that period was insufficient to repay the Consolidated Loan while maintaining a minimal standard of living.  However, without more information regarding the Plaintiff's income and expenses prior to 2009, the Court is unable to determine whether the Plaintiff was capable of making meaningful progress in repaying the Student Loans or the Consolidated Loan prior to surrendering his license in 2012.  Accordingly, the Plaintiff has not shown by a preponderance of the evidence that his past financial resources compared to his past living expenses and any other relevant factors prevented him from paying the student loans in question while still maintaining a minimal standard of living.

*B.   The Plaintiff's Current Income and Expenses.*

Turning to his present financial condition, the Plaintiff testified that he was not employed at the time of trial, having quit his job with Lucas Tree the week before the trial.  He reported that two or three employers had expressed interest in hiring him as a truck driver, that he expected to start work as a truck driver soon, and that he anticipated earning approximately the same amount

of income as he had been earning at Lucas Tree. Assuming he quickly accepted a new offer of employment, therefore, his annual income will be approximately $35,000.00.

A review of the Plaintiff's household expenses reveals that his family lives a modest lifestyle and the cost of daily living consumes almost all of the household's income. The original Schedule J filed in the underlying bankruptcy case showed that the family has just $102.04 in income remaining each month after paying monthly expenses. Although the amended Schedules I and J are unreliable due to their failure to acknowledge the Plaintiff's marriage to Ms. O'Gara, the Plaintiff's interrogatory responses reveal that his household's income and expenses have not changed materially since the case was filed and, therefore, the household's monthly disposable income continues to be around $100.00. Therefore, the Court concludes that the Plaintiff satisfied his burden of establishing that his present income is insufficient repay the Consolidated Loan while maintaining a minimal standard of living.

*C. The Plaintiff's Future Income and Expenses.*

Finally, looking into the future, the Plaintiff did not establish by a preponderance of the evidence that his anticipated income will be insufficient to repay the Consolidated Loan while maintaining a minimal lifestyle.

i.    <u>The Plaintiff's Chiropractic Career.</u>

While admitting that a return to practice is not impossible, the Plaintiff testified that it would be very difficult because: (1) the psychological report may well deem him unfit to return to chiropractic; (2) licensed chiropractors will be unlikely to hire and supervise him; and (3) the chaperone requirement will preclude him from maintaining a viable practice. While the Court appreciates that the re-licensing hurdles set forth in the Third Consent Agreement are both high

and numerous, the Plaintiff failed to provide sufficient evidence to support his assertion that he cannot improve his financial outlook by proceeding forward with that process.

The first obstacle—the psychological report—is significant.   Only a psychological evaluation would likely determine whether the Plaintiff suffers from a condition that prevents him from working in the chiropractic field.   The Plaintiff appears resigned to an adverse finding; indeed, he likened his return to practice to an alcoholic working in a bar.   The Plaintiff seems to believe he suffers from addiction but he never goes so far as to explicitly state that this is the case and he has never been diagnosed with a specific condition. If the Plaintiff had submitted to the psychological exam required by the Third Consent Agreement, and a mental health professional had concluded that (a) he suffers from a condition which prevents him from treating female patients without succumbing to sexual temptation and (b) that such condition is either difficult or impossible to manage, then the Plaintiff would have established that the option of returning to chiropractic medicine is foreclosed to him.   Without a diagnosis, much less a prognosis, there is no way to determine whether the Plaintiff is mentally, emotionally and psychologically capable of working as a chiropractor regardless of whether he can satisfy the other re-licensing conditions.

As this Court recently held, the determination as to whether corroborating medical evidence is necessary "depends on any number of factors such as the nature of the condition, the impact that condition has on the debtor's earning potential and the specifics of the debtor's own testimony regarding the condition."   Erkson v. United States Department of Education (In re Erkson), 582 B.R. 542, 553 (Bankr. D. Me. 2018).   Although the Court held in Erkson that corroborating medical testimony was unnecessary, this case differs in several respects.   Most significantly, the debtor in Erkson had identified her hearing issue, obtained adaptive hearing equipment, and made modifications in her professional life that allowed her to continue working

in her chosen field of study.  Here, although the re-licensing conditions include a mechanism for evaluating the Plaintiff's psychological health, he has taken no steps to determine what condition, if any, plagues him and whether that condition can be treated sufficiently to allow him to return to the chiropractic field.

In a written closing argument, Plaintiff's counsel stated, "Whether his actions are symptomatic of a disease, like alcoholism, as he described, or merely a reckless disregard for the privacy of others, he cannot feasibly return to that profession."  Plaintiff's Closing Argument at 3. This conclusory and self-serving statement is not entirely accurate.  The Third Consent Agreement provides that the Plaintiff may regain his license if he obtains a psychological report deeming him fit to resume his chiropractic career without posing a threat to the public or a particular patient, provided he meets certain other requirements.  The Plaintiff is not necessarily barred from returning to practice if the prior conduct was due to "reckless disregard."  In fact, the Third Consent Agreement suggests that, even if the Plaintiff were diagnosed with a psychological condition, that condition may not prevent him from returning to practice if it could be managed sufficiently to preclude him from posing a threat to the public or a particular patient.

In any event, without corroborating additional evidence this Court is unable to determine whether the Plaintiff suffers from a condition that would prevent him from ever returning to the chiropractic field.  This is not a case in which the Court is being asked to accept a debtor's diagnosis and prognosis of a medical condition.  Here, the Plaintiff is not even asserting that he actually suffers from a specific ailment so there is no way to determine whether he is psychologically barred from resuming his chiropractic career.  *See, e.g.*, Burton v. Educ. Credit Mgmt. Corp. (In re Burton), 339 B.R. 856 (Bankr. E.D. Va. 2005) (denying hardship discharge where debtor suffering from bipolar II disorder did not establish that his mental illness negatively

impacted his ability to generate income where he presented no corroborating evidence beyond his own testimony); <u>Pobiner v. Educ. Credit Mgmt. Corp. (In re Pobiner)</u>, 309 B.R. 405, 419-420 (Bankr. E.D.N.Y. 2004) (debtor's testimony insufficient to establish that his attention deficit hyperactivity disorder precluded him from generating sufficient income to repay his student loans where debtor testified that he is receiving psychotherapy and is taking medication and the debtor did not exhibit signs of hyperactivity during trial).

The Plaintiff's concerns that he will be unable to find a chiropractor willing to hire and supervise him are not persuasive.  To the extent a potential employer is concerned about the risk the Plaintiff might pose to female clients, those concerns may be assuaged by the contents of a favorable psychological report.  Further, the Plaintiff's contention that another chiropractor will not want to associate himself or herself with the Plaintiff due to his prior conduct is not supported by any evidence other than the Plaintiff's testimony on record. The Second Consent Agreement conditioned the Plaintiff's return to active practice upon, among other things, his submission to supervision by a licensed chiropractor for a period of one year.  The Plaintiff did ultimately return to practice so the Court infers that this requirement must have been satisfied.  The Third Consent Agreement is more onerous because it requires the Plaintiff to not merely by supervised by, but to also be employed by, a licensed chiropractor, and this requirement is not subject to a temporal limitation.  However, the Plaintiff previously found at least one chiropractor who was willing to associate with him in a supervisory capacity after the Second Consent Agreement notwithstanding his prior transgressions.  Albeit the path to re-employment in the chiropractic field is harder this time, the Plaintiff's prior success leaves open the question of whether the Plaintiff could find an employer willing to bring him into his or her practice.

Finally, the Plaintiff testified that the chaperone requirement will preclude him from maintaining a financially viable practice for two reasons. The Plaintiff estimated that the majority of chiropractic patients are female. He expects that female clients will not consent to be treated if a third party is present and, therefore, his pool of potential clientele would be significantly limited. Even if, however, female clients do consent to treatment under those conditions, the Plaintiff believed that the cost of paying a third party to observe the session would be financially unfeasible. Once again, however, the Plaintiff's ability to successfully return to practice on the terms of the Second Consent Agreement—which contained the same restriction, though limited to one year—belies the impossibility of satisfying this requirement again. Despite having successfully navigated this requirement on a prior occasion, the Plaintiff did not provide any specific data supporting his assertion that the chaperone requirement would materially and significantly impact his ability to maintain a successful practice. The Court notes that, after the Plaintiff self-reported the first incident leading to the Third Consent Agreement, he imposed a chaperone requirement on himself in an apparent effort to continue his practice. His willingness to voluntarily assume that restriction after having successfully negotiated the same restriction under the Second Consent Agreement suggests that the chaperone requirement may not be as onerous as the Plaintiff now suggests.

This record simply does not provide enough information for a determination as to whether the Plaintiff can feasibly satisfy the re-licensing conditions set forth in the Third Consent Agreement.[8]

---

[8] The Plaintiff testified as to two other roadblocks to regaining his chiropractic license: (1) his shoulder condition; and (2) his unwillingness to return to a field where he faces constant temptation. Even if the existence of his shoulder injury is accepted, he did not testify as to his prognosis, and he offered no expert medical testimony on this issue. The Court cannot determine whether the shoulder condition is an actual impediment to the Plaintiff's chiropractic career. With respect to the second issue, the Court, while sympathetic, points again to the need for a psychological exam in order to determine whether the Plaintiff's concerns regarding temptation are legitimate.

ii.    <u>Credibility Concerns.</u>

The Plaintiff's declarations under penalty of perjury that the information contained in amended Schedule I and Schedule J is accurate, despite those schedules omitting his wife and her income, suggests, at the very least, that the Plaintiff has been careless at times in his financial disclosures.  Viewed in this light, the inconsistencies noted above between the Plaintiff's testimony regarding the household's earning potential and the information shown in schedules filed in case number 09-21874 are troubling.

The lack of corroborating evidence and the inconsistencies between the Plaintiff's testimony and his sworn schedules undermine this Court's ability to determine the Plaintiff's future income with any reliability.

iii.    <u>Expenses.</u>

The Plaintiff asserts that the record shows an increase in his expenses since the filing of the case.  That argument is premised on the expenses shown in amended Schedule J which, presumably, reflect only the Plaintiff's expenses since he erroneously reported at the time that he was unmarried.  The record actually indicates, however, that the Plaintiff's household expenses may actually decrease over time.  Ms. O'Gara will soon pay off her car and a credit card debt, and the Plaintiff's insurance costs should decrease once Ms. O'Gara's daughter is no longer on the family's insurance.  In addition to the possibility of increased income, therefore, the Plaintiff will also soon see a decrease in monthly expenses.

D.  *Other Circumstances.*

i.    <u>The DSO Judgment.</u>

The Plaintiff argues that, whether he finishes out his remaining working years as a chiropractor or as a truck driver, he will never be able to earn enough income to repay both the

Consolidated Loan and the DSO Judgment while maintaining a minimal standard of living. The problem with this argument is that the DSO Judgment, while nondischargeable, is not a fixed expense. The record shows that the state court orders enforcing the DSO Judgment directed the Plaintiff to pay amounts that would be insufficient to repay the obligation in full but which the State Court found to be financially feasible for the Plaintiff after the benefit of a disclosure hearing. If the Court were to discharge the Consolidated Loan, thereby eliminating that monthly expense, the Plaintiff would likely be ordered to increase his monthly payments on the DSO Judgment. On the other hand, it is possible that a state court might decrease the monthly payment amount in light of this Court's determination that the Consolidated Loan is not dischargeable. In other words, while the DSO Judgment is certainly large, the Plaintiff will likely only be ordered to repay the amount a state court determines, after a disclosure hearing, that the Plaintiff is financially capable of repaying.

        ii.    <u>Intentional Underemployment.</u>

ECMC argues that the Plaintiff's inability to repay the Consolidated Loan is due, not to a lack of employability, but to his intentional underemployment. A review of the Plaintiff's work history raises the question of whether he is capable of staying in a position long enough to ever be eligible for advancement. The Plaintiff appears to have changed jobs every couple of years since he graduated from college with a degree in business management. Although the Plaintiff has worked primarily as an unskilled laborer since surrendering his chiropractic license, even those positions may reward loyal employees with pay increases and opportunities to take on new responsibilities. This is particularly true where the employee, like the Plaintiff, has a degree in business management.

The Court did not perceive that the Plaintiff's work history and his frequent job changes were part of a calculated effort to improve his earning potential. The Plaintiff testified in very general terms about having applied for some managerial positions in recent years but says he is underqualified for many such openings because he lacks the experience or industry-specific knowledge potential employers favor. He also claims that the few jobs for which he is qualified pay too little. The Plaintiff did not discuss how much the lower-paying managerial positions pay or identify the positions to which he has applied, nor did he testify as to whether accepting a lower-paying managerial position might provide him with the experience necessary to qualify for better-paying managerial positions.

iii.  Payment History.

The Plaintiff's history of nonpayment is troubling. He first incurred the Student Loans, totaling, at the time, $74,800.00, during his chiropractic studies beginning in 1995 and ending in 1999. There is no record of the Plaintiff's payment history on the Student Loans but the original principal balance of the Consolidated Loan issued on January 9, 2002 suggests that the Plaintiff did not make any substantial progress in repaying the Student Loans prior to consolidation.

The payment history on the Consolidated Loan establishes that the Plaintiff made no payments on that obligation until March 30, 2006 when he made the first of nine payments; the last of which ECMC received on November 19, 2006. The Plaintiff does not appear to have made any payments since.

While nonpayment, in itself, typically would not disqualify a debtor from a hardship discharge under § 523(a)(8), some of the circumstances in this case suggest that the Plaintiff's current financial condition was at least partially self-imposed. For instance, the Plaintiff agreed to

give, and did in fact give, Ms. D'Anto the Promissory Note in June of 2006 even though he had made only nine payments on the Consolidated Loan and was not then making any payments.

The Plaintiff then appears to have almost immediately gone into default on this new obligation.  In fact, the record indicates he made few, if any, payments to Ms. D'Anto until December 30, 2013 when he started paying his ex-wife $75.00 each month pursuant to a State Court order enforcing the DSO Judgment.   Moreover, it appears as though the Plaintiff did not make payments on the Consolidated Loan during the pendency of case number 09-21874 even though the original and amended Schedules I and J established that he was financially capable of doing so.

Where, as here, a debtor's § 523(a)(8) action relies heavily upon the sheer magnitude of his or her nondischargeable debt, that debtor's payment history will be viewed with more scrutiny. In this case, the record suggests that the Plaintiff did not make a diligent effort to repay either the Consolidated Loan or the DSO Obligation during the periods in his life where he was earning sufficient income.

## V.     Conclusion.

The Plaintiff's biggest impediment to a hardship discharge in this case is his failure to carry his evidentiary burden with respect to his past and future ability to repay the Consolidated Loan while maintaining a minimal standard of living.  In light of his failure to meet his original burden of proof, other factors which, standing alone, might not have precluded a finding of economic hardship, carry a heavier weight.  The Plaintiff's frequent job changes and spotty payment history are viewed with more skepticism in the absence of a fully developed evidentiary record establishing his financial condition throughout the years and his failure to introduce corroborating evidence supporting his claim that he cannot return to the chiropractic field weighs more heavily.

Based on the combination of factors in this case, therefore, the Court finds that discharge under §

523(a)(8) is inappropriate and, therefore, will enter judgment in favor of ECMC.